JAMISON, Adm'r, v. REDA PUMP CO. et al.

No. 30450.    May 19, 1942.

*126 P. 2d 71.*

Mart Brown and Ames, Monnet, Hayes & Brown, all of Oklahoma City, for plaintiff in error.

Rainey, Flynn, Green & Anderson, of Oklahoma City, for defendant in error Reda Pump Company.

James H. Ross and Catlett & Kerr, all of Oklahoma City, for defendant in error Denver Producing & Refining Company.

BAYLESS, J. Alexander Jamison, administrator of the estate of Earl W. Tompkins, appeals from the judgment of the district court of Oklahoma county, sustaining the demurrers to his evidence offered by Reda Pump Company, a corporation, and Denver Producing & Refining Company, a corporation.

July 3, 1939, Tompkins hired to Denver by a written contract, the nature of his duties being defined "as a reda pump service engineer" and to "take orders from the company superintendent, W. H. Marshall, at St. Louis, Oklahoma, or by officials of employer." Tompkins was employed to service and repair reda pump equipment; his duties were "to take care of all of our reda pumps . . . he had no other duties"; he serviced the pumps, he made minor repairs that could be made in the field, and sent pumps to the factory at Bartlesville with recommendations for major repairs, he looked after the "connecting and disconnecting the switch box"; and Denver had no other employee to do this work, and Tompkins was on call 24 hours per day.

On the night of July 25th and morning of July 26th he was at the lease in question to connect the reda pump with the switch box when it was required. The pump had been disconnected for four or five days, and it was supposed Tompkins had disconnected the pump.

A cable extended from the pump to the switch box. The cable was covered with a coat of metal armor extending almost to the end of the cable where the connection was made. At this end of the cable three wires protruded. This end of the cable was passed through a hole in the bottom of the switch box, and by a porcelain covered "pothead disconnector" on the bottom shelf of the switch box, and fastened to three posts located on the second shelf of the switch box just above the "pothead disconnector." The electricity is introduced into the switch box by a cable that connects at the top of the switch box, and when the door of the switch box is closed every wire in the switch box is charged. But when the door is opened all electricity is automatically cut off except the "pothead disconnector," which is used to furnish electricity for the lights. Thus at all times there is electricity passing through the "pothead disconnector." As stated, this "pothead disconnector" is covered with porcelain as a protection.

On this occasion Tompkins was advised that a connection was desired, and while he was passing the pump cable through the bottom of the switch box, one of the wires of the cable intruded through a broken place in the "pothead disconnector" and made contact, and electrocuted him. All of this appears from plaintiff's evidence, for defendants introduced no evidence.

We will consider first the contentions between plaintiff and Reda. As a premise, it must be understood there was no contractual relationship between these two. The basis for plaintiff's claim against Reda is that Reda manufactured and sold for use a switch box that was dangerous in its design. Reda's contention is that the switch box was suitable and safe for the purposes for which it was sold to be used.

Plaintiff was forced to correlate with the charge of dangerous design the fact that the "pothead disconnector" had become chipped and broken, thereby permitting the end of the wire to be inserted. But for this last factor it is admitted that Tompkins would not have been injured by reason of the location of the "pothead disconnector." Plaintiff argues that since Reda knew the "pothead disconnector" would be charged at all times, and knew that cable connec-

tions had to be made near it, it should be anticipated that breaks therein would expose workmen to danger. We are of the opinion that this carries the requirements too far insofar as the manufacturer is concerned. If in the design and fabrication of devices the manufacturer is obliged to foresee every kind of an incident that possibly could arise, not alone those that arise from the inherent qualities of the device itself but also those that arise from accident or breakage, the burden would be intolerable.

We are of the opinion that if a device is suitable and safe for the purpose for which it is to be used when it is sold by the manufacturer, the manufacturer has discharged its duty; and the fact that the device becomes dangerous by breakage or depreciation while in use does not constitute an act of negligence on the part of the maker.

There is no proof in the record that the switch box was out of repair or broken when sold. The evidence shows it became chipped and broken while in the owner's use and possession. If it became broken in the owner's possession and use and thereby became dangerous, we can perceive no reason for holding the maker negligent.

In Jazek v. Firuski, 166 N. Y. Supp. 444, it was said, if the purchaser of a device, or his servants, are careless or negligent in the use of a device and it breaks, there is no liability on the manufacturer; that the manufacturer has discharged its duty when it makes a device that will stand proper and reasonable use. See 4 N. C. C. A. (New Series) 788, and annotation; 20 N. C. C. A. 951, and annotation; and several cases cited and extensively annotated in A. L. R. under Manufacturers, implied warranties, liabilities, etc. The demurrer was properly sustained as to Reda.

We now take up a consideration of the case against Denver. The basis for recovery here is negligence because of failure to furnish a safe place to work or to furnish safe tools and appliances.

Plaintiff attacked the discretion of the master in selecting a switch box of the type used here, and Denver asserts it had discharged its duty toward its employee when it selected a device of a standard make and in common use. We think this is a well settled rule. Plaintiff does not lay great stress on this.

Plaintiff was forced to proceed at once to couple the alleged defect in design with the broken "pothead disconnector," and we think this must be the principal reliance of plaintiff.

The only evidence to rely on here is the proof of a broken or chipped hole in the porcelain cover of this disconnector. Otherwise, there could not have been a contact between the disconnector and the wire. It was not shown nor is it contended that contact could have occurred except for the break.

The only eyewitness who professed to have seen the disconnector before and after the accident stated that he saw the disconnector about five hours earlier and did not see the broken place, but he did see it was broken after the accident.

We think the duty that rested on Denver to inspect its tools and appliances and to repair the same should be exercised within reasonable bounds and the alleged breach of this duty should likewise be judged reasonably. The record made by the plaintiff shows that no one but Tompkins had enough contact with this switch box to learn of any changes in its condition that would render it dangerous, and the evidence of the plaintiff is that this broken condition probably did not exist for a longer period than five hours before the accident.

The plaintiff's evidence makes it clear that Tompkins was vice principal of Denver in that he was hired for the specific purpose of maintaining these devices and that this duty rested on him exclusively. The evidence was that he was the only person who used the switch box. If he had notice of the break in the disconnector, the record does not show that he reported it to Denver or

undertook to repair it. Denver relied on him in this respect, and if he did not know that the disconnector was broken, Denver did not know it was broken. If he had notice or knowledge that it was broken and did not notify Denver, then Denver had no notice or knowledge of the fact and consequently was not negligent in the sense that it breached the duty it owed Tompkins. Earl v. Oklahoma, etc., Ry. Co., 187 Okla. 100, 101 P. 2d 249, and cases cited therein.

There is a rule that if a dangerous condition of this kind existed for a length of time such as would justify reasonable men in saying that Denver could or should have learned of the dangerous condition, then it could be considered to have breached the duty it owed Tompkins. However, this rule can have no application here, since plaintiff's evidence shows that the break occurred sometime between midnight and 5 o'clock a.m., when Tompkins' death occurred, and we are of the opinion that this is entirely too short a period of time to constitute constructive notice to Denver under the circumstances.

The judgment of the trial court sustaining the demurrer to the plaintiff's evidence is affirmed.

CORN, V. C. J., and RILEY, OSBORN, GIBSON, HURST, and DAVISON, JJ., concur. WELCH, C. J., and ARNOLD, J., absent.